UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------x
                               :
YALENA DZHINCHVELADZE,         :
                               :
                Petitioner,    :
                               :
        -against-             :        06 Civ. 9415 (LAP)
                               :
UNITED STATES OF AMERICA       :        OPINION AND ORDER
                               :
                Respondent.   :
                               :
-------------------------------x

LORETTA A. PRESKA, United States District Judge:

    Petitioner Yalena Dzinchveladze ("Petitioner") seeks,
by a petition pursuant to 28 U.S.C. 2255, to vacate the
judgment of conviction entered against her on August 25,
2006.  For the following reasons, this petition is denied.

BACKGROUND

A.   Petitioner's Criminal Conduct

    Petitioner was one of approximately fifteen defendants
who were arrested in connection with various fraudulent
activities that were being conducted at certain corrupt
medical clinics engaged in the treatment of no-fault
insurance claimants in New York State.  The scheme involved
large-scale fraud, totaling over $6 million, and involved

the participation of several groups of co-conspirators. (PSR ¶ 27).[1]

Owners of the management companies that ran the medical clinics found the locations at which to open medical clinics; rented or otherwise obtained equipment that was placed at the clinics; found a licensed doctor under whose name they opened and operated the clinics; hired individuals who represented themselves to be doctors, chiropractors, acupuncturists, physical therapists and others to staff the medical clinics; hired administrative staff as receptionists, bookkeepers, filing clerks and billing consultants; employed 'runners' who referred patients to the medical clinics; and, on rare occasions, dealt with patients." (PSR ¶ 28).

"While the owners of the management companies who operated the medical clinics often became involved in processing the false and fraudulent claims that were submitted to the insurance companies for reimbursement for treatment that was either not performed or was not necessary, other individuals employed or hired by the owners also were involved in the process of creating the

---

[1] ("PSR") refers to the Presentence Report submitted by the Probation Office dated June 5, 2006.

claim forms and submitting them to insurance companies. (PSR ¶ 29).

The success of the fraud scheme relied heavily upon the use of people known as "runners," who staged fake accidents involving "patients," who had volunteered to be passengers in the vehicles which were involved in the staged accidents.  The clinic owner generally paid the runners approximately $2,000 for each of the "patients." The runners then paid the "patients" an agreed-upon amount, typically about $200; the "patients" were then required to go through a series of unnecessary medical procedures performed by doctors, therapists and technicians at the medical clinics, or simply signed documents certifying that medical treatment was received.  While the owners generally dealt directly with the runners, other members of the administrative staffs of the clinics also dealt directly with the runners and were aware of the fraudulent nature of the treatment provided to the "patients" at the various medical clinics.  The clinics and doctors earned profits by billing the insurance companies for medical treatment that purportedly was performed on patients who were never actually injured.  (PSR ¶ 30).

The fraud scheme also involved accidents that were not actually staged.  In those cases, the runners located

people who had been in accidents where little or no bodily injury had actually occurred and "coached" the victim on what injuries to report to the doctor at the clinic. As a result, the accident would be billed as a large medical claim, with extensive, but unnecessary, treatment from a network of clinics and doctors, all of whom ultimately would be paid by the insurance companies. Billing was also submitted to insurance companies for visits and procedures that never occurred. (PSR ¶ 31).

Petitioner was an office manager and bookkeeper at 52 & 2 Medical Premises, one of the corrupt medical clinics involved in the scheme. Between March and October 2002, a cooperating witness and several undercover police detectives made repeated visits to the medical clinic during which they obtained medical treatment even though they were not injured. (PSR ¶ 51). During these visits, the cooperating witness and the undercover detectives observed that Petitioner was involved in all aspects of the operation of the 52 & 2 Medical Premises, and that she had frequent and continuous contact with all patients and employees at the 52 & 2 Medical Premises. (PSR ¶ 62).

Specifically, on March 6, 2002, when the cooperating witness first went to the clinic, he was met by Petitioner. Petitioner brought the cooperating witness to various

doctors and therapists at the 52 & 2 Medical Premises. Petitioner also gave the cooperating witness approximately twenty documents to fill out, including a personal information form, an attorney authorization form, a no-fault insurance form, an authorization to release information form, and an authorization for treatment of a child form, even though there was no indication that any care of a child was involved in the cooperating witness' case.  One of the practitioners that the cooperating witness saw on that first day was an acupuncturist who attempted to treat him with invasive acupuncture needles. When the cooperating witness refused the acupuncture treatment, the acupuncturist told him that he needed to use needles in order to bill the insurance companies for the treatment.  When the cooperating witness continued to refuse treatment, Petitioner intervened and said that she would handle the problem and that they would try to work it out.  Petitioner told the cooperating witness that he had to return for additional treatment the very next day. (PSR ¶ 63).

The cooperating witness returned to 52 & 2 Medical Premises on March 7, 2002, and saw additional doctors, including a general practitioner and a chiropractor.  The cooperating witness also saw the acupuncturist, and he

again refused invasive acupuncture treatment.  At the end of this session, Petitioner told the cooperating witness that she would recommend a lawyer for him and that since his case was so special, she wanted to recommend the right lawyer for him.  (PSR ¶ 64).  As discussed above, the filing of a lawsuit is an integral part of these insurance fraud schemes, as it permits the participants to collect additional monies from the insurance companies.

On June 17, 2002, the cooperating witness met with Vladislav German, one of Petitioner's co-conspirators, and offered to refer three undercover police detectives as "patients" to the 52 & 2 Medical premises.  The cooperating witness told German that he was in possession of a police accident report for the three patients.  German offered to pay the cooperating witness $3,000 for referring the three patients, and the cooperating witness agreed to send them to the clinic the next day. (PSR ¶ 51).  German and the cooperating witness then went into a room where Petitioner was present.  German gave Petitioner the police accident report.  Petitioner reviewed the report and then told the cooperating witness that he "would be taken care of," meaning paid, when the cooperating witness brought the patients to the clinic.  (PSR ¶ 51).

On or about June 18, 2002, Petitioner met with one of the undercover police detectives who had gone to the 52 & 2 Medical premises as a "patient" seeking treatment.  During this visit, the undercover detective refused to undergo any acupuncture treatment that included the use of needles. After the undercover specifically refused such treatment, Petitioner nevertheless tried to persuade the undercover to take the acupuncture treatment, apparently without regard to whether the undercover actually needed such treatment. (PSR ¶ 65).

According to the cooperating witness and the undercover detectives, Petitioner was the individual at the 52 & 2 Medical Premises who repeatedly insisted that they had to return frequently for additional treatments. (PSR ¶ 66).  As described above, none of these individuals suffered from any injuries during the time they went to the 52 & 2 Medical Premises and received treatments.

B.   Petitioner's Guilty Plea

1.   The Plea Agreement

On April 10, 2006, Petitioner, her counsel, and the Government executed a written plea agreement.  In the plea agreement, the Government agreed to accept a guilty plea from Petitioner to Counts One and Five of the Indictment and, in return, to dismiss any remaining open counts

against the defendant at the time of sentencing.
Petitioner and the Government stipulated that Petitioner's
base offense level was six, pursuant to United States
Sentencing Guidelines ("U.S.S.G." or "Guidelines") Section
2B1.1, and that a twelve-level increase in the offense
level was warranted, pursuant to U.S.S.G. Section
2B1.1(b)(1)(G), because the loss resulting from the
offenses charged in Counts One and Five of the Indictment
that was reasonably foreseeable to the defendant was more
than $200,000 but not more than $400,000.  The parties also
stipulated that a further two-level increase in the offense
level was warranted because the offense involved more than
ten but fewer than fifty victims, pursuant U.S.S.G. Section
2B1.1(b)(2)(A)(i).  After applying a three-level reduction
for acceptance of responsibility, pursuant to Guidelines
Section 3E1.1(a) and 3E1.1(b)(2), the parties reached an
agreed-upon total offense level of seventeen.  Petitioner
and the Government also agreed that Petitioner had no
criminal history points, resulting in a Criminal History
Category of I.

Based upon all of these calculations, the parties
agreed that Petitioner's Sentencing Guidelines range was 24
to 30 months imprisonment.  In the plea agreement,
Petitioner agreed that no departure from the stipulated

Sentencing Guidelines range of 24 to 30 months was warranted, and that she would not seek either a downward departure or an adjustment of the Guidelines computation. Petitioner further agreed that a sentence within the stipulated Guidelines range of 24 to 30 months would be a reasonable sentence in light of all of the factors set forth in Title 18, United States Code, Section 3553(a).

Petitioner further agreed that she would "not file a direct appeal from, nor litigate under Title 28, United States Code, Section 2255 and/or Section 2241, any sentence within or below the Stipulated Sentencing Guidelines range of 24 to 30 months imprisonment . . . ."

2.   <u>The Plea Proceeding</u>

On April 10, 2006, Petitioner appeared before this Court and entered a guilty plea to Counts One and Five of the Indictment.  Before accepting Petitioner's guilty plea, the Court conducted a hearing which complied in all respects with Rule 11 of the Federal Rules of Criminal Procedure.

At the outset of the proceeding, the Court determined that Petitioner was competent to plead guilty and had the opportunity to review all aspects of her case with her

attorney.  (Plea Tr. 2-5).[2]  The Court confirmed that
Petitioner had reviewed a copy of the Indictment with her
counsel, who had explained the charges against her.  (Plea
Tr. 4).  The Court also ensured that Petitioner understood
the elements of the offenses charged in Counts One and Five
of the Indictment.  (Plea Tr. 4).

The Court then directed Petitioner's attention to her
written plea agreement with the Government and had the
Assistant United States Attorney summarize certain
provisions in the agreement for Petitioner, including
Petitioner's agreement not "to file an appeal or otherwise
litigate or challenge a sentence within or below" the
stipulated Sentencing Guidelines range of 24 to 30 months.
(Plea Tr. 6-7).  The Court confirmed that Petitioner
understood the terms and conditions of the plea agreement
as described by the Government.  (Plea Tr. 7).   In
particular, the Court confirmed that Petitioner understood
that the parties had "agreed that a sentence between 24 and
30 months would be a reasonable sentence."  (Plea Tr. 7-8).
The Court also confirmed that Petitioner had reviewed the
agreement with her attorney, that there were no additional
agreements between the parties other than those set forth

---

[2] ("Plea Tr.") refers to the Transcript dated Apr. 10, 2006,
wherein Petitioner withdrew her previous plea of not guilty
and entered a plea of guilty to Counts One and Five.

in the written plea agreement, and that no promises, other than those in the plea agreement, or threats had been made to induce her to plead guilty.  (Plea Tr. 8-9).

Next, the Court determined that Petitioner understood the rights that she was waiving by pleading guilty, including her right (a) to plead not guilty and proceed to a trial by jury at which she would be presumed innocent and where the jury would decide whether the Government proved its case beyond a reasonable doubt; (b) to the assistance of appointed counsel at every stage of the proceedings; (c) to confront and cross-examine witnesses; (d) to compulsory process; and (e) against compelled self-incrimination. (Plea Tr. 9-10).  Petitioner stated that she understood each of these rights.  (Plea Tr. 9-10).

The Court also confirmed that Petitioner understood the maximum penalties applicable to the offenses charged in Counts One and Five of the Indictment, as well as the effect of any supervised release term.  (Plea Tr. 11-12). The Court also ensured that Petitioner understood that her sentence would be governed by the Sentencing Guidelines and the other factors set forth in Title 18, United States Code, Section 3553, and that she had discussed the application of the Guidelines with her attorney.  (Plea Tr. 12-13).  The Court also confirmed that Petitioner was

"fully satisfied with the advice and representation given
to [her] by [her] attorney." (Plea Tr. 13-14).

     During the plea proceeding, Petitioner confirmed that
she was "offering to plead guilty because [she was] in fact
guilty." (Plea Tr. 14).  The Court then inquired as to the
factual basis for Petitioner's plea. (Plea Tr. 14-15).  In
response, Petitioner stated that she was "the manager in a
medical office . . . and I was asking people, patients to
come in the clinic, and then [the] billing department was
billing that visits, fraud visits to make money." (Plea
Tr. 14).  Petitioner further explained that by the term
"fraud visits" she meant patients "with no injuries," that
she knew that the patients she was asking "to come in" did
not have any injuries, that "the billing department was
billing insurance companies" for those patients, and that
she knew her conduct was unlawful. (Plea Tr. 14-15).
Petitioner also agreed that "on or about March 6, 2002,
[she] provided approximately 20 documents to a cooperating
witness to fill out in connection with receiving medical
treatment at 5202 [sic] Medical in Brooklyn" as charged in
the Indictment. (Plea Tr. 15).

     Following Petitioner's allocution, the Court stated
that it was satisfied that Petitioner was competent, and
that her guilty plea was knowing and voluntary and was

adequately supported by an independent basis in fact. (Plea Tr. 16)  Accordingly, the Court accepted Petitioner's guilty plea.  (Plea Tr. 16).

C.    Sentencing Proceedings

Prior to Petitioner's sentencing, the United States Probation Office ("Probation Office") prepared the PSR in which the Probation Office set forth its Sentencing Guidelines analysis.  The Probation Office computed Petitioner's total offense level as 17. (PSR ¶ 108).  The PSR reported that Petitioner had no prior convictions, and thus was in Criminal History Category I.  (PSR ¶ 111).  The Probation Office's calculation yielded a Guidelines range of 24 to 30 months imprisonment.

On August 25, 2006, Petitioner appeared before this Court for sentencing.   At the outset, the Court confirmed that Petitioner did not have any objections to the PSR. (Sent. Tr. 2).[3]  The Court accepted the Sentencing Guidelines calculation contained in the PSR and determined that the applicable Guidelines range was 24 to 30 months' imprisonment.  (Sent. Tr. 2-3).

The Court then gave defense counsel the opportunity to be heard as to an appropriate sentence.  (Sent. Tr. 3-4).

_____

[3] ("Sent. Tr.") refers to the transcript of sentencing proceedings dated Aug. 25, 2006.

Defense counsel asked the Court for leniency based upon Petitioner's limited involvement in the charged offenses, her background, and her concern over supporting her daughter. (Sent. Tr. 3). The Court also gave the defendant the opportunity to speak, and Petitioner stated "I feel very sorry, and I know I'm guilty and I am apologizing that I made that [sic] for government. I'm sorry." (Sent Tr. 4).

The Court imposed a sentence of 24 months imprisonment, the bottom of the applicable Sentencing Guidelines range, on each count to run concurrently, followed by a period of three years supervised release, and a $200 special assessment. (Sent. Tr. 6).

After imposition of the sentence, defense counsel requested a recommendation from the Court that Petitioner be designated to a facility close to New York. The Court granted that request and further ordered that "the time and place of designation will be as determined by the Bureau of Prisons but no later than October 31, 2006." (Sent. Tr. 8).

D. Post-Conviction Proceedings

Petitioner did not file a direct appeal of her conviction.

14

In her Section 2255 petition pending before this
Court, Petitioner alleges that her prior counsel provided
ineffective assistance in various ways.  In particular,
Petitioner contends that her prior counsel: (1) failed to
"challenge the indictment," specifically Count Five of the
Indictment, on the grounds that it "fails to meet the Sixth
Amendment requirements to give a defendant notice of both
the nature, as well as the cause for the accusation"; (2)
failed to "familiarize himself with the facts of the case";
(3) failed to advise her that her plea agreement "locked"
her into a 24 month sentence as opposed to a non-custodial
sentence; (4) failed "to prepare a sentencing memoranda";
and (5) failed "to bring to the Court's attention at
sentencing" the omission of certain facts in the PSR,
resulting in an "undeserved two year term" of imprisonment.
(Dayan Aff.).[4]

---

[4] ("Dayan Aff.") refers to the affidavit and petition of
Albert Y. Dayan, Petitioner's attorney, dated Oct. 3, 2006.

ANALYSIS

A.   General Applicable Law

"As a general rule, relief is available under [28 U.S.C.] § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error or law that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." Napoli v. United States, 32 F.3d 31, 35 (2d Cir. 1994) (internal quotations and citations omitted).

Significantly, in order to warrant a hearing,

> the [§ 2255] application must contain assertions of fact that a petitioner is in a position to establish by competent evidence. Whether there is a genuine issue of material fact depends upon the sufficiency of those factual allegations. Airy generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing.

United States v. Aiello, 814 F.2d 109, 113 (2d Cir. 1987) (internal citations omitted). Thus, a petition seeking relief under § 2255 "must be accompanied by a detailed and specific affidavit which shows that the petitioner had actual proof of the allegations going beyond mere unsupported assertions." Prewitt v. United States, 83 F.3d 812, 819 (7th Cir. 1996) (internal quotations and citations

omitted).  And, accordingly, claims based on the mere <u>ipse</u>
<u>dixit</u> of the defendant are not sufficient to warrant habeas
relief.  <u>See</u> <u>Dean v. United States</u>, 265 F.2d 544, 545 (8th
Cir. 1959).

B.   Standards Governing Ineffective Assistance Claims

A defendant seeking to attack her conviction based on
ineffective assistance of counsel must: (a) show that
counsel's performance fell below "an objective standard of
reasonableness" under "prevailing professional norms," and
(b) "affirmatively prove prejudice," <u>i.e.</u>, demonstrate that
"there is a reasonable probability that, but for counsel's
unprofessional errors, the result of the proceeding would
have been different."  <u>Strickland v. Washington</u>, 466 U.S.
668, 687-89, 693-94 (1984); <u>accord</u> <u>United States v. Vegas</u>,
27 F.3d 773, 777 (2d. Cir 1994); <u>Mayo v. Henderson</u>, 13 F.3d
528, 533 (2d Cir. 1994).

In analyzing a claim that counsel's performance fell
short of constitutional standards, the Court "must indulge
a strong presumption that counsel's conduct falls within
the wide range of reasonable professional assistance."
<u>Strickland</u>, 466 U.S. at 689.  Under <u>Strickland</u>, an
attorney's

> strategic choices made after thorough
> investigation of law and facts relevant

> to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.

Strickland, 466 U.S. at 690-91.  Moreover, "[i]n assessing the attorney's performance, a reviewing court must judge his conduct on the basis of the facts of the particular case, 'viewed as of the time of counsel's conduct,' and may not use hindsight to second-guess his strategy choices." Mayo, 13 F.3d at 533 (quoting Strickland, 466 U.S. at 690); see also Strouse v. Leonardo, 928 F.2d 548, 553 (2d Cir. 1991); United States v. Jones, 918 F.2d 9, 11-12 (2d Cir. 1990).

To demonstrate prejudice with respect to a decision to plead guilty, the second part of the Strickland analysis requires the defendant to show that there is a reasonable probability that, but for counsel's errors, she would not have pleaded guilty and would have insisted on going to trial.  Hill v. Lockhart, 474 U.S. 52, 59 (1985); United States v. Couto, 311 F.3d 179, 187 (2d Cir. 2002).

Moreover, the Supreme Court has noted that the "object of an ineffectiveness claim is not to grade counsel's performance," and "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient

prejudice, . . . that course should be followed."
Strickland, 466 U.S. at 697.  Applying this teaching, the
Court of Appeals has often rejected ineffectiveness claims
by determining that, in view of the strength of the
prosecution's case, the defendant is unable to establish
prejudice.  See, e.g., Strouse v. Leonardo, 928 F.2d at 556
(court declines to address alleged deficiencies of counsel
given the overwhelming evidence of guilt at trial); United
States v. Simmons, 923 F.2d 934, 956 (2d Cir. 1991)
("[G]iven the plethora of evidence against [appellant],
there is little reason to believe that alternative counsel
would have fared any better."); United States v. Reiter,
897 F.2d 639, 645 (2d Cir. 1990) (although counsel's
performance at times fell below professional standards,
Sixth Amendment claim fails "given the overwhelming
evidence against [the defendant]").

      Finally, when a defendant makes a statement that she
gave her plea voluntarily during the plea allocution, she
cannot later argue, without any evidence, that the plea was
somehow coerced.  See United States v. Gonzalez, 970 F.2d
1095, 1100-01 (2d Cir. 1992) ("[D]efendant must present
some significant questions concerning the voluntariness or
general validity of the plea to justify an evidentiary
hearing"; allegations that "merely contradict the record

. . . or are simply conclusory" are insufficient).   There is a very substantial presumption of truthfulness for statements made by a defendant during a plea allocution. See, e.g., United States v. Juncal, 245 F.3d 166, 171 (2d Cir. 2001) (holding that testimony during a plea allocution "carries such a strong presumption of accuracy that a district court does not, absent a substantial reason to find otherwise, abuse its discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made").

C.   Petitioner's Claims of Ineffective Assistance At
        Sentencing Are Barred By Her Plea Agreement

Petitioner's 2255 petition alleges, in part, that her prior counsel was ineffective based upon his "failure to prepare a sentencing memoranda" and his "failure to bring to the Court's attention at sentencing" the omission of certain facts in the PSR, resulting in an "undeserved two year term" of imprisonment.   However, she expressly waived such challenges to her sentence in her plea agreement. Accordingly, these sentencing-related claims are denied.

Petitioner's plea agreement contained an express waiver of her right to appeal or otherwise challenge her sentence if she received a sentence of 30 months or less. "It is by now well established that a knowing and voluntary

waiver of the right to appeal is generally enforceable."
United States v. Hernandez, 242 F.3d 110, 113 (2d Cir.
2001); see also United States v. Haynes, 412 F.3d 37, 39
(2d Cir. 2005); United States v. Morgan, 406 F.3d 135, 137
(2d Cir. 2005); United States v. Garcia, 166 F.3d 519, 521
(2d Cir. 1999); United States v. Chen, 127 F.3d 286, 289
(2d Cir. 1997); United States v. Yemitan, 70 F.3d 746, 747
(2d Cir. 1995); United States v. Salcido-Contreras, 990
F.2d 51, 53 (2d Cir. 1993) ("In no circumstances . . . may
a defendant, who has secured the benefits of a plea
agreement and knowingly and voluntarily waived the right to
appeal a certain sentence, then appeal the merits of a
sentence conforming to the agreement.").

A defendant may also waive her right to bring a
petition pursuant to section 2255.  See Frederick v.
Warden, Lewisburg Corr. Facility, 308 F.3d 192, 195-96 (2d
Cir. 2002); Garcia-Santos v. United States, 273 F.3d 506,
508-09 (2d Cir. 2001); Muniz v. United States, 360
F.Supp.2d 574, 577 (S.D.N.Y. 2005).  The Court of Appeals
has recognized a very narrow set of exceptions to the
general rule of enforceability of such waivers, requiring
proof that: (1) the waiver was not made knowingly,
voluntarily, and competently; (2) the sentence imposed was
based on constitutionally impermissible factors, such as

ethnic, racial or other prohibited biases; (3) the
government breached the plea agreement; or (4) the court
failed to enunciate any rationale for the sentence. See
United States v. Gomez-Perez, 215 F.3d 315, 319 (2d Cir.
2000). A waiver of collateral attack rights in a plea
agreement also may not be enforceable when a defendant
claims ineffective assistance of counsel in connection with
the plea agreement itself. See Frederick, 308 F.3d at 195;
Hernandez, 242 F.3d at 113-14.

Petitioner's express waiver of the right to appeal, or
"litigate under Title 28, United States Code, Section 2255
. . . any sentence within or below the Stipulated
Sentencing Guidelines Range of 24 to 30 months
imprisonment," precludes her section 2255 challenge to her
sentencing proceedings. Petitioner does not contend that
her waiver was either unknowing or involuntary, nor can
she. At Petitioner's plea hearing, the Court specifically
asked Petitioner if she had discussed the sentencing
guidelines with her attorney, to which Petitioner responded
"Yes, your Honor." (Plea Tr. 7). Furthermore, the Court
confirmed that Petitioner understood the plea agreement,
including the appellate waiver and the guideline range to
which she had stipulated.

22

Nor does Petitioner argue that her sentence was based on constitutionally impermissible factors, that the Government breached the plea agreement, or that the Court failed to explain the reasons for the sentence.  To the extent that Petitioner contends that she received ineffective assistance in entering the plea agreement, those claims are frivolous, as discussed below.

D.   Petitioner's Other Claims of Ineffective Assistance Are Wholly Without Merit

In her 2255 petition, Petitioner additionally claims that her prior counsel was ineffective for: (1) failing to "challenge the indictment," specifically Count Five of the Indictment, on the grounds that it "fails to meet the Sixth Amendment requirements to give a defendant notice of both the nature, as well as the cause for the accusation" (Dayan Aff. at 1); (2) for failing to "familiarize himself with the facts of the case"  (Dayan Aff. at 2); and (3) for having "locked" his client into a plea agreement that called for a minimum of 24 months imprisonment.  (Dayan Aff. at 4).  These allegations fail to meet either prong of the Strickland test.  Accordingly, Petitioner's 2255 petition must be denied.

As an initial matter, during the plea hearing, which complied in all respects with Rule 11 of the Federal Rules

of Criminal Procedure, the Court asked Petitioner a series
of questions about her relationship with her attorney and
the quality of her legal representation.  Petitioner
acknowledged that she had received the Indictment and
reviewed it with her attorney, who had explained the
charges against her.  (Plea Tr. at 4).  The Court
specifically asked Petitioner: "Are you fully satisfied
with the advice and representation given to you by your
attorney, Mr. [Robert] Macedonio?" (Plea Tr. at 13).  To
this question, Petitioner unequivocally responded, "Yes,
your Honor." (Plea Tr. at 14 ).  Furthermore, the Court
confirmed Petitioner's understanding of her plea agreement,
and Petitioner acknowledged that she had signed the
agreement after having had enough time to review the
agreement and review it with her attorney, Mr. Macedonio.
(Plea Tr. at 8).

     With respect to Petitioner's first ineffectiveness
claim, any motion to dismiss the Indictment for failing to
adequately notify her of the nature of the charges against
her would have been frivolous.

     Under the Sixth Amendment to the United States
Constitution, a defendant enjoys the right to "be informed
of the nature and cause of the accusation" against her.
However, all that is required to satisfy this

constitutional mandate is that the indictment "inform[] the defendant of the offense charged with sufficient clarity so that he will not be misled while preparing his defense." United States v. Brozyna, 571 F.2d 742, 746 (2d Cir. 1978) (citations omitted).  Moreover, "[i]t is well settled that an indictment is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  United States v. Alfonso, 143 F.3d 772, 776 (2d. Cir. 1998) (internal quotation marks omitted).  The Court of Appeals has explained that an indictment must "charge[ ] a crime with sufficient precision to inform the defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events."  United States v. Stavroulakis, 952 F.2d 686, 693 (2d Cir. 1992).  Nevertheless, "an indictment need do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime."  Id. (internal quotation marks omitted).

Count Five of the Indictment satisfies these requirements.  It charged as follows:

> From in or about November 1999, up to
> and including in or about November
> 2002, in the Southern District of New
> York and elsewhere . . . YELENA
> DZHINCHVELADZE . . ., the defendants,
> and others known and unknown,
> unlawfully, willfully and knowingly did
> execute, and attempt to execute, a
> scheme and artifice to defraud health
> care benefit programs and to obtain, by
> means of false and fraudulent
> pretenses, representations, and
> promises, money and property owned by,
> and under the custody and control of,
> health care benefit programs, in
> connection with the delivery of and
> payment for health care benefits, items
> and services, to wit, the submission of
> false and fraudulent claims for
> insurance based on fictitious injuries
> claimed by individuals who had been, or
> claimed to have been, in automobile
> accidents.

Thus, Count Five of the Indictment tracked the language of

the statute, included all of the necessary elements of the

charged offense, specified the time and place of the crime,

and explained the nature and substance of the charged

fraudulent scheme in the "to wit" clause.  The charge

succinctly and clearly informed Petitioner that the

Government intended to prove that, from November 1999 to

November 2002, she and her co-defendants executed a scheme

to defraud health care benefit programs by submitting false

and fraudulent claims for insurance reimbursement based

upon health care services the defendant and her co-

conspirators claimed to have provided to individuals who

had been, or claimed to have been, in car accidents from which they suffered fictitious injuries.  This description of the charge could not have misled the defendant in any way so as to prevent her from preparing a defense.

Petitioner notes that the Indictment failed to identify specific patients who were "fraudulently treated and billed to an insurance carrier." (Dayan Aff. at 12). However, the lack of such detail does not make the charge constitutionally deficient.  "Recognizing that particular facts needed in particular cases are obtainable by bills of particulars or discovery," the Court of Appeals has "repeatedly refused, in the absence of any showing of prejudice, to dismiss . . . charges for lack of specificity." United States v. McClean, 528 F.2d 1250, 1257 (2d Cir. 1976) (citation and internal quotation marks omitted); see also Stavroulakis, 952 F.2d at 693.  In this case, the specific acts undertaken by Petitioner and her co-conspirators in conducting the fraud were detailed in the complaint and search warrant affidavits that were provided to the defense.  In addition, the Government produced massive amounts of discovery prior to Petitioner's guilty plea, including patient files, fraudulently submitted insurance claims, consensual recordings of meetings with Petitioner and others, and wiretap recordings

of telephone conversations among the co-conspirators concerning their fraudulent activities, including conversations in which Petitioner participated.   Thus, Petitioner cannot claim any prejudice as a result of the purported lack of specificity of Count Five.

The Petitioner's reliance on Russell v. United States, 369 U.S. 749 (1962), for a requirement of even greater specificity is misplaced.   The Second Circuit and other Circuit Courts of Appeals have repeatedly distinguished the holding in Russell based upon the unique circumstances of the case, the critical nature of the fact omitted from the charge, and the history of "unfairness and uncertainty" in prosecutions under the specific statutory provision charged in the indictment in Russell.   See, e.g., United States v. McClean, 528 F.2d 1250, 1257 (2d Cir. 1976) ( "In this case, appellants point to no comparable history of confusion, prejudice, or unfairness generated under the" statute charged in the indictment.); United States v. Walsh, 194 F.3d 37, 45) (2d Cir. 1999);   United States v. Paulino, 935 F.2d 739, 750 n. 4 (6th Cir. 1991) (collecting cases).   Similarly, United States v. Bobo, 344 F.3d 1076 (11th Cir. 2003), is inapposite.   In Bobo, the Eleventh Circuit deemed a count in an Indictment to be deficient where it completely omitted a necessary element of the

charged offense.  Like Count Five in the present case, the
indictment at issue in Bobo charged the defendant with
committing health care fraud in violation of Title 18,
United States Code, Section 1347.  However, the Bobo
indictment did not contain any allegation that the fraud
was "in connection with the delivery of or payment for
health care benefits, items, or services," as required by
the statutory language.  Bobo, 344 F.3d at 1084.  Nor did
the Bobo indictment explain the nature of the alleged
fraudulent scheme in any way.   Id.  In contrast, Count
Five of the Indictment against Petitioner tracks the
statutory language in its entirety, includes all the
elements of the offense, and specifies that the scheme
involved submitting fraudulent insurance claims for
patients with fictitious injuries from automobile
accidents.

     Even if Petitioner's prior attorney could have
presented a non-frivolous challenge to the sufficiency of
the allegations contained in Count Five of the Indictment,
Petitioner would still have faced charges of conspiracy,
mail fraud, wire fraud, and health care fraud, as alleged
in Counts One through Four of the Indictment.  Petitioner's
2255 petition, notably, does not contend that any of these
of other counts was deficient.  Accordingly, Petitioner's

claim that her lawyer was ineffective for failing to challenge the Indictment cannot satisfy the prejudice prong of the <u>Strickland</u> test.

Petitioner's second ineffective assistance claim – that her attorney failed to adequately "familiarize himself with the facts of the case" (Dayan Aff. at 4) – also lacks merit. Petitioner seems now to make an actual innocence claim. In her 2255 petition, Petitioner alleges that her prior attorney would not have advised her to plead guilty, or at least not recommended that she enter into a plea agreement, had he understood the facts of the case. She suggests that she is "an innocent woman," who only pleaded guilty because (1) she had received "bad advice, that she would get more time if she insisted upon a trial"; and (2) she lacked the financial resources to finance a multi-defendant trial. (Dayan Aff. at 3).

Significantly, Petitioner has submitted no affidavit in support of her 2255 petition. Thus, her new attorney's representations concerning the advice she received from her prior counsel are wholly unsupported. Indeed, they are flatly contradicted by Petitioner's sworn statements at her plea and sentencing hearings.

During the plea allocution, the Court explicitly asked Petitioner if she was "offering to plead guilty because

[she was] in fact guilty?" (Plea Tr. at 14). Petitioner answered unequivocally, "Yes, your Honor." (Id.). The Court also confirmed that Petitioner had not been "induced to offer to plead guilty as a result of any fear, pressure, threat, or force of any kind," and that she had not been "induced to offer to plead guilty as a result of any statement by anyone not set forth in . . . [the] plea agreement to the effect that you would get special treatment, special leniency, or some kind of special consideration if you pleaded guilty rather than going to trial." (Plea Tr. at 8-9). Moreover, the Court ensured that Petitioner understood that she had a right to plead not guilty and proceed to trial, and that if she could not "afford an attorney, one [would] be appointed to represent you free of charge." (Plea Tr. at 9).

Again, at her sentencing proceeding, Petitioner admitted, "I know I'm guilty." (Sent. Tr. 4).

Furthermore, contrary to the claims made in her 2255 petition, Petitioner admitted to knowingly participating in health care fraud during her plea allocution. Specifically, Petitioner stated that she recruited "patients" who had "no injuries" to "come in the clinic" and "then the billing department was billing insurance companies." (Plea Tr. 14-15). The Court asked Petitioner

31

if she "knew she [sic] didn't have any [in]juries, you asked them to come in, and you billed insurance companies for them . . . ?" (Plea Tr. 14-15). Petitioner responded "Yes . . . ." (Plea Tr. 15). Petitioner further admitted that she "knew this was unlawful." (Plea Tr. 15).

In sum, the Court accepts Petitioner's contemporaneous, sworn statements from her plea allocution and sentencing, and rejects the inconsistent hearsay representations made by her attorney in her 2255 petition. Petitioner's admission of guilt is fully supported by the evidence in the case. Thus, Petitioner's claim that her attorney failed to adequately "familiarize himself with the facts of the case" is meritless, and, in light of the strength of the Government's case, fails to establish prejudice.

Petitioner's remaining ineffectiveness claim – that her attorney "locked" her into a 24-month sentence without her knowledge – is similarly meritless. Petitioner now claims that she pleaded guilty based upon her understanding that "it would be likely that her sentence would not result in custody" but that, in fact, her attorney had "locked her into a twenty four month period of incarceration pursuant to the plea agreement." (Dayan Aff. at 4, 6). However, this argument both mischaracterizes the plea agreement

32

between the defendant and the Government and is flatly contradicted by her own statements under oath.

The plea agreement between Petitioner and the Government did not "lock" her into any term of imprisonment.  Although Petitioner agreed that a sentence within the applicable Sentencing Guidelines Range of 24 to 30 months imprisonment would be reasonable, the plea agreement allowed Petitioner to ask for a lower sentence based upon the other relevant sentencing factors under Title 18, United States Code, Section 3553(a).

At her plea hearing, the Court made sure that Petitioner understood the terms of the plea agreement and the possible sentence that she was facing.  In particular, the Court and Petitioner engaged in the following colloquy:

> Court:    Do you understand that . . .
> you and the Government have
> agreed that neither of you
> will seek an upward or a
> downward departure from that
> 24 to 30-month range?
>
> Defendant:    Yes, your Honor.
>
> Court:    Do you understand that you
> and the Government have
> agreed that a sentence
> between 24 months and 30
> months would be a reasonable
> sentence?
>
> Defendant:    Yes, your Honor.

        Court:     Have you had enough time to
                   review the agreement and to
                   go over it with Mr. Macedonio
                   and to have all of your
                   questions answered?

        Defendant:     Yes, your Honor.

(Plea. Tr. 7-8).  Petitioner answered these questions

clearly and without any equivocation.  Thus, Petitioner

cannot now credibly claim that she did not understand the

Stipulated Guidelines range contained in the plea agreement

or that she did not have sufficient time to discuss the

agreement with her attorney.  (Dayan Aff. at 6).


                         CONCLUSION


     For the foregoing reasons, Petitioner's habeas claims

are entirely meritless and have no legal or factual basis.

Accordingly, no hearing is necessary on any of Petitioner's

claims, and the petition is dismissed.


SO ORDERED:

DATED:     February 20, 2007
           New York, New York



                         _Loretta A. Preska_
                         LORETTA A. PRESKA, U.S.D.J.


                             34